UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **NATIONAL WRECKING CORPORATION,**    * <br><br> Plaintiff/Counter-Defendant,    * <br><br> v.    * <br><br> **TURNER CONSTRUCTION COMPANY**    * <br><br> Defendant/Counter-Plaintiff.    * | **Civil Action No.** <br>                1:07-cv-00404-LMB-TCB |

\* \* \* \* \* \* \* \* \* \* \* \*  \* \* \* \* \* \* \* \* \* \*

**TURNER CONSTRUCTION COMPANY'S
<u>OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE EXPERT REPORTS</u>**

Defendant and Counter-Plaintiff Turner Construction Company ("Turner"), hereby opposes National Wrecking Corp.'s ("NWC's") Motion to Strike the Expert Reports previously served by Turner. As discussed below, Turner's expert reports meet the requirements for the admissibility of expert testimony, as well as the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure. As a result, Plaintiff's Motion to Strike should be denied.

**I.      Project Background**

This case involves a dispute between a general contractor, Turner, and its subcontractor, NWC, related to the construction of an office building in Arlington, Virginia. NWC was responsible for completing the earthwork and excavation for the Project. Because NWC was required to excavate the site so that the foundations for the building could be constructed, NWC was among the very first contractors to work on the Project. NWC's work was on the "critical path" because its excavation work needed to be completed before the rest of the necessary construction could proceed. After the excavation was complete, the concrete subcontractor could pour the foundations, and then follow-on contractors could proceed with their work as the building progressed.

NWC's subcontract with Turner provided that it had 20 weeks to complete its work. Turner authorized NWC to begin work on October 11, 2004, which meant that NWC was required to complete its work by March 3, 2005. NWC did not complete its work, however, until at least June 18, 2005, or 107 days late. Ultimately, the Project was completed 140 days late. The owner of the Project assessed against Turner and its subcontractors 90 days of this delay, which resulted in a liquidated damages assessment against Turner in the amount of $900,000.

In this lawsuit, NWC sued Turner to recover amounts allegedly due under the subcontract between the parties, as well as for certain claimed additional work. Turner filed a counterclaim against NWC seeking to recover costs it incurred as a result of NWC's delays (including the portion of liquidated damages assessed against Turner by the Owner that were caused by NWC), as well as for costs paid to other subcontractors to mitigate those delays.

## II.     Procedural Background

As required by the Scheduling Order, Turner and NWC have exchanged expert reports relating to certain of the claims in this case. Specifically, Turner has provided an expert analysis from Mr. Robert M. Lockhart, demonstrating, among other things, that NWC was responsible for 77 days of critical path delay to the completion of the Project. As discussed herein, Mr. Lockhart's analysis properly considered and identified the relevant facts and circumstances necessary to reach its conclusions, and is based upon a proper and accepted methodology. Turner has also submitted an accounting expert report from Mr. Matthew Krafft identifying the daily rate of Turner's Project general conditions.

NWC subsequently served separate expert reports from Robert Beers in response to both the Lockhart and Krafft reports. The Beers' responsive reports disputed various positions taken in the Lockhart and Krafft reports. Turner has also provided counsel for NWC with rebuttal information from both Lockhart and Krafft in order to address certain of the issues identified by

Mr. Beers, as well as to provide NWC with additional information it requested.  See Exhibits A and B.  Mr. Lockhart's supplemental disclosure, among other things, confirms that his investigation and conclusions were based upon a "critical path analysis" utilizing an as-planned to as-built methodology, which is consistent with the methodology used in the construction industry.  He also confirmed that he considered all relevant Project documents and information in performing his analysis.  See Exhibit A.

On August 31, 2007, NWC filed a motion to compel discovery and for an extension of the Court's Scheduling Order.  NWC's motion to compel sought to require Turner to produce certain additional documents, as well as to require Turner to supplement its interrogatory answers relating to various issues that occurred after NWC left the Project.  Prior to the hearing on September 7, the parties agreed to various issues related to the production of documents.  NWC's motion regarding Turner interrogatory responses was heard by Judge Buchanan.  At that hearing, NWC was seeking to require Turner to identify and analyze all issues on the Project, even those unrelated to NWC's work.  For example, NWC's interrogatory No. 5 stated as follows:

> 5. Identify each and every delay and/or disruption that you contend impacted the Prime Contract work activities, with reference to the original Project Schedule and for each affected activity, state the duration of the impact and the relation and impact on succeeding activities.

Turner had objected to this interrogatory as being overly broad with respect to information and activities that occurred well after NWC left the Project and that would not be relevant to the issues in this case.  Turner did identify information relevant to the time periods in question, including the information set forth in the Lockhart Report.  Judge Buchanan ruled that Turner was not required to supplement its prior interrogatory responses because NWC had not

shown that information relating to delays *after* NWC left the Project was relevant to the case. See Exhibit C.

Depositions of experts in this case have not occurred, but are scheduled for the week of September 24, 2007. A jury trial has not been requested by any party.

**III.  NWC's Motion To Strike Should Be Denied**

    **A.  Standard For Expert Testimony**

Under Federal Rule of Evidence 702, expert testimony may be offered to the extent such testimony is both relevant and reliable. Specifically, Fed. R. Evid. 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, <u>a witness qualified as an expert</u> by knowledge, skill, experience, training, or education, <u>may testify</u> thereto in the form of an opinion or otherwise, <u>if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.</u>  <u>Fed.</u> <u>R.</u> <u>Evid.</u> 702.

When determining whether proffered testimony satisfies these standards, courts should remain mindful that "Rule 702 was intended to liberalize the introduction of relevant expert evidence" and that, rather than wholesale exclusion of testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Westberry v. Gilslaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999); <u>Daubert v. Merrel Dow Pharms.</u>, 509 U.S. 579, 596 (1993).

Here, NWC seeks to deny this Court an opportunity even to consider Lockhart's expert opinion because, NWC alleges, those opinions are not reliable under Rule 702. As discussed below, the Lockhart Report meets the applicable standards for reliability. Moreover, the issues raised by NWC regarding the Lockhart Report are properly the subject of cross-examination, and are not grounds for exclusion.

4

B.     **The Lockhart Report Meets The Standard For Expert Testimony**[1]

Contrary to the assertions in NWC's Motion Strike, the Lockhart Report is based upon accepted and reliable methodology, is based upon sufficient facts and data, and Mr. Lockhart applied the methodology reliably to the facts of this case.

1.     **The Lockhart Report Includes A Critical Path Analysis Using The Accepted As-Planned As-Built Scheduling Methodology**

a.     **Summary Of The Lockhart Analysis**

As stated in the Lockhart Report, Mr. Lockhart was asked to determine if delays incurred during the construction of the Project were the responsibility of NWC, and if so, to determine the number of days of Project delay for which NWC was responsible. As noted above, there is no dispute that the Project was completed 140 days late, and that the Owner has assessed Turner and its subcontractors with 90 days of delay to the Project completion. See Exhibit D. The 90 days of delay assessed against Turner has resulted in the Owner deducting from Turner liquidated damages at the rate of $10,000 per day (or $900,000) in accordance with the terms of the Turner/Owner contract. See Exhibit D. As the total Project delay had already been established, Turner did not ask Mr. Lockhart to perform a global analysis for the purpose of establishing total overall delay in support of a claim against the Owner.

Mr. Lockhart was provided access to the Turner Project files that were also produced to NWC in this lawsuit. Mr. Lockhart has not been provided with any records that were not also produced to NWC. Mr. Lockhart specifically reviewed over 15 boxes of these Project records, including *all* Project schedules, Turner's daily reports, subcontractor daily reports, contract drawings, contract specifications, correspondence between Turner and its subcontractors and correspondence between Turner and the Owner. Exhibit E, p. 5.

---

[1]     NWC's Motion to Strike does not challenge the Krafft Report under Rule 702.

5

Mr. Lockhart then performed an analysis to determine if NWC caused critical path delays to the completion of the Project. In performing this analysis, Mr. Lockhart identified the as-planned or "baseline" schedule as NR01. This schedule was a CPM (critical path method) schedule prepared by Turner during the Project, and relied upon by the parties in performing the work. As identified by Mr. Lockhart, the baseline schedule showed NWC's work to be on the Project's critical path such that delays to NWC's work would necessarily result in delays to overall Project completion. See Exhibit E, p. 6. In addition to the schedules showing NWC's work to be critical, it is also factually and logically evident that NWC's work was critical because no subsequent trades could begin until the excavation of the building was completed.

After identifying the appropriate baseline schedule, Mr. Lockhart then reviewed and analyzed the various "as-built" data on the Project relating to the time periods relevant to NWC's work in order to determine whether critical path delays had occurred, the extent of the delays, and the responsibility for any such delays. Thus, Mr. Lockhart's report included a critical path analysis using the as-planned to as-built methodology. Mr. Lockhart's analysis was presented using a "windows" format, which is an acceptable and common method of presenting delay analysis. See Exhibit F, p. 2.

Ultimately, Mr. Lockhart's analysis indicated that NWC was responsible for 77 days of delay to the completion of the Project. In reaching this conclusion, Lockhart credited NWC with time recovered due to resequencing by Turner and concurrent work of others during the time when NWC was on the Project. The delays attributable to NWC would have been greater had Lockhart not considered these contemporaneous and concurrent activities. See Exhibit E, p. 10; Exhibit A, p. 1.

### b. The Lockhart Report Includes A Critical Path Analysis

NWC's assertion that the Lockhart Report does not employ "critical path analysis" is simply wrong. As stated in the "Assignment" portion of the Lockhart Report, Lockhart was asked, among other things, to "determine the number of days that NWC caused *the Project* to be delayed." Exhibit E, p. 4 (emphasis added). This necessarily involves identifying the Project critical path, and determining whether NWC's work was on the critical path. In performing his analysis, Mr. Lockhart reviewed all of the Project schedules prepared by Turner during the Project. See Exhibit E, p. 5; Exhibit A, p. 1. These schedules were created using a software package known as Primavera, which generates CPM (Critical Path Method) schedules in accordance with the standards of the industry. The "baseline" schedule (NR01), specifically referenced in the Lockhart Report as being the as-planned schedule, was created using this methodology and was attached as an exhibit to the Lockhart Report. That schedule identifies the excavation work of NWC as on the critical path. See Exhibit E, p. 7. The Lockhart Report specifically identifies critical path delays by NWC: "The 55 days of delay indicated equates to an eleven week, or 77 calendar days, delay to the critical path to the project completion." Exhibit E, p. 16.

As noted in the case law cited by NWC, "[a] delay, or acceleration, of work along the critical path will affect the entire project." Youngdale & Sons Construction Co. Inc. v. United States, 27 Fed.Cl. 516, 550 (1993). Likewise, "[d]elay involving work not on the critical path generally [has] no impact on the eventual completion days of the Project." Id. Therefore, if NWC's work is deemed to be on the Project critical path, then delays to that work would necessarily delay the Project completion. In this case, Mr. Lockhart determined that NWC's work was critical by relying on the contemporaneous CPM Project schedules indicating that work to be critical, as well as logic and experience dictating that the excavation work of NWC

must be completed before the follow-on trades can begin their work. There is nothing unreliable regarding that determination and analysis, and NWC has failed to advance any argument that its work was not on the critical path.

### c. Lockhart Employed The Accepted As-Planned To As-Built Method Of Critical Path Analysis

The Lockhart Report employed the accepted "as-planned to as-built" critical path methodology to reach its conclusions. See Exhibit E. Indeed, the Lockhart Report specifically states that "[t]he analysis of the delays incurred for the project was conducted by comparing when activities were scheduled with when activities were actually performed." Exhibit E, p. 6. After the appropriate as-planned schedule was identified by Mr. Lockhart, all as-built data relevant to NWC's performance was analyzed by Mr. Lockhart. As noted above, these documents specifically included all Project schedules, Turner's daily reports, subcontractor daily reports, contract drawings, contract specifications, correspondence between Turner and its subcontractors, and correspondence between Turner and the Owner. These documents are specifically referenced in the Lockhart Report as being relied upon in his analysis. See Exhibit E, p. 5. Mr. Lockhart summarized his analysis as follows:

> The investigation and conclusions of the Lockhart Report are consistent with the CPM methodology used throughout the industry. The Lockhart Report is the result of an investigation that included a Critical Path analysis utilizing an As-planned to As-built methodology throughout the performance of the NWC work. Once the amount and timeframe of the delays were established, the responsibility for the delays were then assessed consistent with the contemporaneous documentation regarding all of the work, including daily reports, correspondence, the contracts, meeting minutes, etc.

> There were subsequent events that delayed the completion of the project as well as an acceleration effort as documented by the recovery schedule. However, such events would not serve to either increase or decrease the number of days of delay chargeable to NWC. As stated in the Lockhart Report, NWC's work was on the critical path and therefore NWC's delays resulted in delays to the project completion.

8

<u>See</u> Exhibit A, p. 2.  This analysis and approach by Lockhart is reliable and consistent with industry practice for a critical path schedule analysis.  Indeed, NWC has cited no authority for the proposition that such an established and straightforward approach should be excluded.

### 2. Lockhart's Prior Report In The Costello Case Is Not Inconsistent With His Current Report

NWC has raised for the first time in its Motion to Strike a previous report prepared by Mr. Lockhart in a case styled as <u>Costello Construction Company of Maryland, Inc. v. J.D. Long Masonry, Inc.</u>, Case No 1:05-cv-742.  NWC's current counsel retained Mr. Lockhart as an expert in that case.  NWC's characterization of the Lockhart Report in <u>Costello</u> is inaccurate and misleading.  A review of that report indicates that Mr. Lockhart had criticized the opposing expert's analysis because it did not consider certain facts that were relevant to the analysis provided.  Mr. Lockhart did not challenge the particular methodology employed.  Mr. Lockhart has explained his role and opinions in the Costello case as follows:

> Finally, you asked me to comment upon the report I prepared in the Costello Construction Co v. J.D. Long Masonry case.  In that case, I was retained by counsel for JD Long Masonry to rebut a delay analysis by Costello's expert.  That case involved delays to the completion of an office building.  Costello served an expert report claiming that JD Long Masonry was responsible for the delays.  The criticisms I stated regarding the Costello report were relating to his failure to consider factual information upon which Costello reached its concussions [sic].  In this case, all relevant factual information necessary to determine the delays attributable to NWC was considered.  The two (2) Lockhart reports are in no way inconsistent in approach in methodology.

Exhibit A, p. 3.

A review of the <u>Costello</u> report confirms Mr. Lockhart's position.  The vast majority of the report was dedicated to pointing out factual information that was contrary to the positions taken in Costello's report.  In this case, Mr. Lockhart has stated that he considered all relevant factual information, including the factual information identified by NWC, in completing his analysis.  Thus, there is no inconsistency in Lockhart's position.  In any event, if NWC believes

9

the reports to be inconsistent, those issues can be identified in deposition and in cross-examination. There is certainly no basis to exclude the Lockhart Report based upon NWC's after-the-fact interpretation of his prior report in another case, and NWC has cited no authority for such a request.

### 3. The Lockhart Report Considered All Documentation Necessary To Determine The Delays To Project Completion Caused By NWC

NWC also contends that the Lockhart Report failed to consider other delays before, during and after NWC's work was completed. NWC's position is again mistaken. As stated above, Lockhart reviewed all of the documentation necessary to determine whether NWC caused critical path delays to the Project and the extent of those delays. The construction records prior to and concurrent with NWC's work were specifically reviewed and considered by Lockhart. Subsequent delays were also considered by Lockhart. However, as Mr. Lockhart stated, each minor and subsequent event that may have occurred well after occurred NWC left the Project would not serve to impact the delays for which NWC is responsible:

> The Beers Report claims that the Lockhart Report failed to consider project delays after NWC's work. Mr. Lockhart did consider these delays as may be caused by the owner, the general Contractor, other subcontractors or vendors. These delays are not chargeable to NWC nor did they excuse NWC's prior delays.

See Exhibit A, p. 2.

As this statement makes clear, subsequent events, while considered by Mr. Lockhart, would not serve to either increase or decrease the number of days of Project delay for which NWC was responsible. Rather, that analysis is properly based upon the critical path delays caused by NWC while they were performing work on the Project. In denying NWC's motion to compel additional interrogatory responses from Turner regarding "each and every" Project delay after NWC left the Project, Judge Buchanan also clearly recognized that this subsequent information was not relevant to the issues involved in this case. See Exhibit C.

10

### 4. The Case Law Cited By NWC Does Not Support The Relief Sought In This Motion

In support of its request that this Court strike the Lockhart Report, NWC relies on four decisions: three by the federal circuit, <u>Titan Pacific Construction Co. v. United States</u>, 17 Cl. Ct. 630, 1989 WL 78828 (Cl. Ct. 1990), <u>Youngdale & Sons Construction Co., Inc. v. United States</u>, 27 Fed. Cl. 516 (Fed. Cl. 1993), <u>Mega Const. Co., Inc. v. United States</u>, 29 Fed. Cl. 396 (Fed. Cl. 1993), and one by the Supreme Court of Virginia, <u>TechDyn Systems Corp. v. Whittaker Corp.</u>, 245 Va. 291 (Va. 1993). These decisions, however, do not support NWC's position because they do not involve the exclusion of expert testimony under <u>Daubert</u> or Rule 702, and they do not undermine or criticize the methodology employed by Mr. Lockhart to reach his conclusions.

In <u>Titan</u>, the Claims Court simply held that the Armed Services Board of Contract Appeals (ASBCA) had substantial evidence to support its decision to reject the plaintiff's contention that it was entitled to several hundred days of delays. <u>Titan</u>, 17 Cl. Ct. at 642. The ASBCA had reasoned that the plaintiff was entitled to fewer days of excusable delay than claimed because the plaintiff's analysis disregarded "facts that actually existed in on-site operations" and utilized a "theoretical" rather than actual as-planned schedule. <u>Id.</u> at 637-638. In this case, however, Mr. Lockhart did examine all relevant data and the as-planned schedule identified and employed by Mr. Lockhart was actually used on the Project.

In <u>Youngdale</u>, the Court of Federal Claims rejected portions of the expert's analysis because it failed to consider "as-built" activities and because, during cross-examination, the expert admitted that the report was laden with errors. <u>Youngdale</u>, 27 Fed. Cl. at 551, 552. Indeed, the Court merely emphasized what is not disputed here: in order for any construction activity to delay a construction Project, that activity must have been on the critical path of the

11

work.  Id. at 550.  Here, the evidence is clear that NWC's work was on the critical path and, in fact, delayed completion of the Project.

In Mega Construction, the Court of Federal Claims denied a plaintiff's claim that the government delayed its work in connection with the construction of a post office.  Mega Construction, 29 Fed. Cl. at 435.  After considering the complete testimony of the plaintiff's expert at a hearing on the merits, the court found that the expert lacked credibility and that his testimony should not be given weight because, among other things, the expert had admitted that "neither the base bar chart he prepared, nor plaintiff's as-planned bar chart, actually constituted a critical path schedule."  Id. at 427.  Here, however, the Lockhart analysis expressly identifies the critical path of the work using established CPM schedules in reaching his conclusions regarding the delays to the Project critical path.

Finally, the Supreme Court of Virginia's decision in TechDyn, 245 Va. 291 undermines NWC's argument to this Court.  In TechDyn, the Supreme Court of Virginia held that once a party produces evidence "within a reasonable degree of certainty" that another party is responsible for alleged delay, then factual disputes regarding causation and contribution fall squarely within the province of the jury.  Id. at 298.  In TechDyn, the plaintiff had entered into a subcontract with Whittaker whereby Whittaker agreed to provide certain software to support a federal contract to develop and install an air-to-ground warning system in Iceland.  Id. at 293-294.  The project suffered severe delays, and TechDyn sought to recover delay damages from Whitaker.  Id.  After a jury awarded delay damages to TechDyn, the trial court entered a judgment notwithstanding the verdict, and TechDyn appealed.  Id.  The Supreme Court reversed the trial court's decision, explaining:

> It is true that Whittaker presented evidence and argued at trial that the delay damages that TechDyn incurred were attributable to causes other than Whittaker's

> contractual breaches. However, once TechDyn met its prima facie burden of producing evidence to show within a reasonable degree of certainty that the share of damages and delay for which Whittaker was responsible, it was the jury's province to resolve any factual disputes. Thus, we hold that TechDyn proved its delay damages with the requisite degree of reasonable certainty and that the trial court erred… Id. at 298.

Likewise, in this case Turner should be permitted to present its expert's testimony at trial, and the Court should be allowed to resolve any differences of opinion or factual disputes between the parties.

### 5. The Lockhart Report Is Based Upon Sufficient Facts And Data

NWC's Motion to Strike also contends that Mr. Lockhart did not base his report on sufficient facts and data. As discussed above, however, Mr. Lockhart did in fact review and consider all relevant data. NWC's specific contention that Lockhart did review all Project schedules is plainly contradicted by his disclosures. Exhibit E, p. 5; Exhibit A, p. 1.

### 6. The Lockhart Report Reliably Applies The Method Employed To The Facts

The discussion above demonstrates that the Lockhart Report is the result of applying an established methodology for determining critical path delay to the relevant facts. The result is a reliable analysis demonstrating that NWC caused 77 days of critical path delay to the completion of the Project. While NWC understandably does not like the conclusions and opinions of the Lockhart Report, there is no basis for excluding it under Federal Rule of Evidence 702. Not surprisingly, NWC has cited no authority for the Court to grant a motion to strike an expert's report under these circumstances.

On the contrary, previous case law for this Court suggests that the motion to strike should be denied. In MercExchange, LLC. v. eBay, Inc., 275 F. Supp.2d 695 (E.D. Va. 2003) (rev'd in part on other grounds, MercExchange, LLC v. eBay, Inc., 401 F.3d 1323 (Fed. Cir. 2005)), after a trial on the merits, the defendants challenged the reliability of expert testimony addressing the

13

computation of a "reasonable royalty" to which plaintiff claimed entitlement because of the defendants' alleged patent infringement. Id. at 706. According to the defendants, the experts' use of the "gross merchandise sales" method to calculate a reasonable royalty was not only uncommon, but ignored failed transactions in sales, among other things. Id. at 707-708. The Court denied the motion to strike, observing that, at trial, the defendants had the opportunity to cross examine the experts on these very issues, and that it was properly within the province of the jury "to weigh the experts' credibility and determine whether the use of GMS [gross merchandise sales method] was appropriate in this case." Id. at 708. As in MercExchange, NWC's complaints about the Lockhart's Report are precisely the kinds of questions that NWC should pose during cross-examination at trial or during the Lockhart deposition (which NWC has yet to take).

        **C.**        **Both Expert Reports Meet The Requirements Of Rule 26(a)**

Federal Rule of Civil Procedure 26(a)(2)(B) provides that parties wishing to introduce expert testimony should exchange "a written report," and that the report should "contain…the data or other information considered by the witness in forming the opinions." Fed. R. Civ. P. 26(a)(2)(B). Surprisingly, NWC has now suddenly invoked Fed. R. Civ. P. 37(c)(1) to sanction an alleged failure to identify with sufficient certainty the documents that Turner's experts considered. NWC asks this Court to exclude the Krafft and Lockhart expert reports. NWC's argument is baseless and disingenuous, especially in light of its own conduct in this case.

First, Turner's experts have complied in full with the required disclosures. Each Turner expert identified in their reports the documents reviewed. As NWC knows full well, each of these categories identified by Mr. Lockhart correspond to appropriately labeled boxes of documents that NWC itself has reviewed. The disclosure rules do not impose a burden on the disclosing party to separately list each and every document considered, and NWC has offered no

14

authority in support of its apparent contention.  The one case that NWC cites, Trigon Insurance Co. v. United States of America, 204 F.R.D. 277 (E.D. Va. 2001), is inapplicable.  Trigon merely addresses the scope of the disclosure rules and the consequences of evidence spoliation.  Here, however, Turner has made available the documents that its experts considered.

Second, it is apparent that prior to this motion, NWC shared the same interpretation of Rule 26(a) as Turner, as evidenced by the following description of the materials reviewed by NWC's expert in his five-page expert report regarding NWC's claims in this case:

> As part of my analysis, I reviewed Subcontract documents, plans, specifications, correspondence, meeting minutes, TCCO Daily Construction Reports, NWC accounting records[2], Seismic Survey reports, and other contemporaneous Project documents.

See Exhibit G, p. 2.  Obviously, this description falls far short of meeting the standard that NWC is now attempting to impose upon Turner.  Turner has also informed NWC on numerous occasions that the documents considered by Mr. Lockhart were the same materials that were produced to NWC previously, and Turner has provided to NWC additional material requested by NWC's counsel.  See Exhibit H.  There is certainly no mystery as to the identity of these materials and NWC has been provided access to all of these materials.

With respect to the Krafft Report, Mr. Krafft identified in his report the documents which he considered and counsel for Turner has provided those documents again separately to NWC.  See Exhibit I.  There is simply no basis for NWC's request to strike Turner's expert reports on the grounds that materials considered have not been identified and provided to NWC.

---

[2] NWC has to date failed to provide Turner with its accounting records, including costs reports, despite repeated requests by counsel.

**IV.     Conclusion**

For the reasons stated above, NWC's Motion to Strike Turner's expert reports, and for sanctions under Rule 37, should be denied.

>                             Respectfully submitted,
>
>
>                             By: _____/s/_____
>                                 Jeffrey M. Hummel, VSB #38558
>                                 SEYFARTH SHAW LLP
>                                 815 Connecticut Avenue, N.W., Suite 500
>                                 Washington, DC  20006-2400
>                                 Telephone: (202) 463-2400
>                                 Facsimile: (202) 828-5393
>
>                                 Counsel for Defendant and Counter-Plaintiff

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing Turner Construction Company's Opposition to Plaintiff's Motion to Strike Expert Reports was served by ECF this 18th day of September 2007, upon:

>    Seth A Robbins, Esq.
>    Quagliano and Seeger, P.C.
>    2620 P Street, NW
>    Washington, DC  20007


>        _____/s/_____
>        Jeffrey M. Hummel

16